UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| A&R BODY SPECIALTY AND | : | |
| COLLISION WORKS, INC., | : | |
| FAMILY GARAGE, INC. and | : | |
| THE AUTO BODY ASSOCIATION | : | |
| OF CONNECTICUT on Behalf | : | |
| of Themselves and all | : | |
| Others Similarly Situated, | : | |
| | : | |
| | : | |
| v. | : | CIV. NO. 3:07CV929 (WWE) |
| | : | |
| PROGRESSIVE CASUALTY | : | |
| INSURANCE COMPANY and | : | |
| PROGRESSIVE DIRECT INSURANCE | : | |
| COMPANY. | : | |
| | : | |
| | : | |

RULING ON MOTIONS TO QUASH AND/OR FOR PROTECTIVE ORDERS
[Doc. ## 245, 257]

Non-parties, the Insurance Association of Connecticut

("IAC") and its Executive Director Robert A. Kehmna, move for an

order quashing two subpoenas served by plaintiffs, A&R Body

Specialty, Family Garage and the Auto Body Association of

Connecticut, on behalf of themselves and all others similarly

situated, or, in the alternative, move for a protective order.

[Doc. # 245].  Defendants, Progressive Casualty Insurance

Company and Progressive Direct Insurance Company (collectively

"Progressive"), also move to quash the subpoenas served on non-

parties IAC and Mr. Kehmna or, in the alternative, for a

protective order.  [Doc. # 257].  On January 29, 2013, the Court

held oral argument on the motions to quash.   For the reasons

that follow, the motions to quash [Doc. ## 245, 257] are GRANTED
IN PART AND DENIED IN PART.

I.  **BACKGROUND**

This action is brought by plaintiffs, A&R Body Specialty,
Family Garage and the Auto Body Association of Connecticut, on
behalf of themselves and all other licensed auto body repairers
in the State of Connecticut who have performed repairs during
the class period for any person with automobile insurance from
Progressive.  Plaintiffs allege that defendants illegally
suppressed labor rates paid to auto body repair shops and
illegally steered their insured to a network of preferred body
shops it controls under its direct repair program. In Counts I
and II, plaintiffs seek recovery under the Connecticut Unfair
Trade Practices Act ("CUTPA").  In Count III, plaintiffs seek to
recover under the Connecticut Unfair Sales Practice Act and in
Count IV plaintiffs claim tortious interference with business
expectancy. [Doc. # 172].

The IAC is a voluntary trade association that represents
insurers conducting business in Connecticut. [Doc. # 256-2, Aff.
of Robert Kehmna("Kehmna Aff."), at ¶3].  The IAC's main
function "is to provide government and public relations services
for the insurance industry and to advance the legislative and
regulatory agenda and lobbying efforts of [its] members." [Id.].
Mr. Kehmna has been the president of the IAC since 1992, and is
also an attorney. [Id. at ¶¶ 2, 9].  Progressive, the IAC, and

Mr. Kehmna allege that Mr. Kehmna provides legal advice and counsel to the IAC's members, including Progressive.

## II.  LEGAL STANDARD

Parties may obtain discovery regarding any non-privileged matter that is relevant to the subject matter involved in the pending litigation. Fed. R. Civ. P. 26(b)(1). The information sought need not be admissible at trial as long as the discovery appears reasonably calculated to lead to the discovery of admissible evidence. Fed. R. Civ. P. 26(b)(1).

Notwithstanding the breadth of the discovery rules, the district courts are afforded discretion under Rule 26(c) to issue protective orders limiting the scope of discovery. Dove v. Atlantic Capital Corp., 963 F.2d 15, 19 (2d Cir. 1992) ("[t]he grant and nature of protection is singularly within the discretion of the district court..."). When the party seeking the protective order demonstrates good cause, the court "may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including ... that the disclosure or discovery not be had." Fed. R. Civ. P. 26(c)(1). "The party resisting discovery bears the burden of showing why discovery should be denied." Chamberlain v. Farmington Sav. Bank, 247 F.R.D. 288, 289 (D. Conn. 2007) (citing Blankenship v. Hearst Corp., 519 F.2d 418, 429 (9th Cir. 1975)).

Upon timely motion, a Court must quash or modify a subpoena that "requires disclosure of privileged or other protected

3

matter, if no exception or waiver applies; or subjects a person to undue burden." Fed. R. Civ. P. 45(c)(3)(A)(iii)-(iv).

## III. **DISCUSSION**

Plaintiffs seek to depose a representative of the IAC and Mr. Kehmna (the IAC and Mr. Kehmna are hereinafter collectively referred to as the "non-parties"). Plaintiffs also seek the production of twenty (20) categories of documents from the IAC. The requests are not limited to information concerning Progressive. Plaintiffs group the requests into four categories: (1) documents concerning communications and meetings between the IAC and governmental offices or agencies (Req. ## 1-3, 14-15); (2) documents and/or communications related to certain public documents attached to plaintiffs' subpoenas (Req. ## 5-10); (3) documents concerning lobbying efforts, including steering and labor rates (Req. ## 11-13); and (4) documents relating generally to the structure of the IAC and/or establishing the factual predicate for Progressive's claim of an attorney-client relationship with the non-parties (Req. ## 4, 14-20).

A.   Relevancy

The non-parties contend that the information and documents sought are not relevant, and that the subpoenas should be quashed and/or a protective order issued. Plaintiff argues that the documents sought are relevant, and seeks "reciprocal" information from defendants' paid lobbyist.

4

Federal Rule of Civil Procedure 26(b)(1) governs the relevance of documents requested by a Rule 45 subpoena. Griffith v. United States, No. M8-85(JFK), 2007 WL 1222586, at *2 (S.D.N.Y. Apr. 25, 2007). "Information that is reasonably calculated to lead to the discovery of admissible evidence is considered relevant for the purposes of discovery." Valiante v. VCA Animal Hosp., Inc., Civ. No. 3:09CV2115(WWE), 2011 WL 219672, at *1 (D. Conn. Jan. 20, 2011) (citations omitted). "Relevance" under Rule 26(b)(1) "has been broadly defined to include 'any matter that bears on, or that reasonably could lead to other matter[s] that could bear on any issue that is or may be in the case.'" Arroyo v. Dep't of Pub. Safety, Civ. No. 3:11CV268(WWE), 2012 WL 3113139, at *1 (D. Conn. July 31, 2012) (quoting Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978)).

As an initial matter, the Court notes that plaintiffs' document requests are not limited to communications between the IAC and Progressive.  In their memorandum in opposition, and at oral argument, plaintiffs contend that one of Progressive's principal defenses is that the market determines the rates to be paid to the auto body shop class members, and that Progressive does not look to other insurance companies to determine when to adjust labor rates.  [Doc. # 261, Memo in Opp., at 22; Doc. # 275, Hr'g Tr. Jan. 29, 2013, at 28:22-25, 29:1-16]. Plaintiffs moreover submit that the communications among the members sought are limited to those regarding steering and labor

rates.  [Doc. # 275, Hr'g Tr. Jan. 29, 2013, 42:9-13].   Because
the information sought by plaintiffs "reasonably could lead to
other matter[s] that could bear on any issue that is or may be
in the case", the Court finds that the requests are proper, even
where not limited to communications with Progressive.

      1. *Documents concerning communications and meetings*
*between the IAC and governmental offices or agencies (Req. ## 1-*
*3, 14-15)*

Requests 1-3 seek documents relating to communications
between the IAC and various governmental offices and agencies
concerning Automobile Physical Damage Repair.  Requests 14-15
seek documents relating to any meetings or hearings with
employees of various governmental offices and agencies relating
to Automobile Physical Damage Repair.[1]

In addition to arguing the documents sought are not
relevant, the non-parties also argue that plaintiffs may obtain
the requested information directly from the governmental offices
or agencies.  Based on the record before it, the Court rejects
this argument, and finds that plaintiffs have attempted to
obtain the requested documents without success. See Doc. #262,
David Slossberg Aff. ("Slossberg Aff.), at ¶ 17; see also Doc. #
279-1, Depo. Tr., Feb. 15, 2013, 68:2-25; 69:1-25; 70:1-25
(deposition testimony of Debra Korta, former Legislative Program
Manager for the State of Connecticut Insurance Department,
indicating the IAC and Mr. Kehmna may be the sole source of

---

[1] Plaintiffs' subpoena defines "Automobile Physical Damage Repair" as
"refer[ring] generally to post collision repair of automobiles, estimation of
said damages, and the process of payment by insurance companies of said
claims."

information sought).  Plaintiffs' requests seek documents related to Automobile Physical Damage Repair, a process central to the issues in this case.  Because these requests appear reasonably calculated to lead to the discovery of admissible evidence, the Court finds requests 1-3 and 14-15 proper.

      2. *Documents and/or communications related to six public documents attached to plaintiff's subpoena (Req. ## 5-10)*

Plaintiffs admittedly are in possession of the six (6) public documents that are the subject of requests 5-10. However, the requests do not ask for copies of these documents, but rather seek documents and communications relating to them. At oral argument, plaintiffs claimed that the underlying documents are relevant to their CUPTA claims because the documents "deal with issues regarding the role of appraisers and steering and labor rates." [Doc. # 275, Hr'g Tr. Jan. 29, 2013, 24:20-25; 25:1-2]. Plaintiffs additionally state that these requests are made to "determine (i) whether (and if so, when) IAC received copies of drafts of the documents, (ii) whether it played any role in drafting or submitting feedback on the documents, and (iii) whether the documents were transmitted to its members." [Doc. # 261, at 7].  While Progressive admits that the underlying documents are relevant to the case, indeed "key to a lot of the arguments [they will] be making at summary judgment", Progressive also argues that "the fact that the IAC possesses these documents […] has no relevance whatsoever to this litigation." [Doc. # 275, Hr'g Tr. Jan. 29, 2013, 14:11-

7

25].  The Court disagrees.  Given the admitted relevance of the underlying documents, the Court finds that requests 5-10 are reasonably calculated to lead to admissible evidence, and therefore proper.

       3.*Documents concerning lobbying efforts regarding steering and labor rates (Req. ## 11-13)*

Requests 11-13 seek documents relating to lobbying efforts regarding steering and labor rates, issues at the heart of this litigation.  Moreover, Progressive has likewise sought documents relating to plaintiff, Auto Body Association of Connecticut's, lobbying efforts, and taken the position that such information is reasonably calculated to lead to the discovery of admissible information.  [Doc. # 261, Memo in Opp., at 8].  Based on the foregoing, the Court finds that requests 11-13 are proper as they are reasonably calculated to lead to the discovery of admissible evidence.

       4.*Documents relating generally to the structure of the IAC and/or establishing the factual predicate for Progressive's claim of an attorney-client relationship with the non-parties (Req. ## 4, 16-20)*

Request 4 seeks distribution lists of the IAC for communicating with member insurance companies.  During oral argument, plaintiffs' counsel admitted that plaintiffs "already have the distribution list", and that Progressive provided it to plaintiffs [Doc. # 275, Hr'g Tr. Jan. 29, 2013, 41:10-12].  Although plaintiffs admittedly have a copy of the distribution list, the Court finds request 4 over broad and will limit production to the list of members with whom the IAC communicates

8

concerning Automobile Physical Damage Repair.  Requests 16 and 17 seek newsletters and website information relating to Automobile Physical Damage Repair.   The Court finds requests 16 and 17 could lead to matters that could bear on issues in the case, and are therefore proper.[2]

Requests 18-19 seek information substantiating the non-parties' claims of privilege with third parties. In light of the Court's ruling on the non-parties' and Progressive's assertion of the common interest doctrine, Requests 18-19 are moot.  The Court will not require that the IAC produce documents responsive to these requests.

Finally, request 20 seeks communications with any legal or lobbying representative of an insurance company concerning Automobile Physical Repair.  This request seeks information that could bear on issues in the case, and is therefore proper to the extent it does not seek privileged information, as set forth below.

B.   Abuse of Process

The non-parties next contend that the Court should quash the subpoenas and enter a protective order to prevent plaintiffs from abusing the Court's subpoena power.[3]  Central to this

_____

[2] During oral argument, counsel for the IAC stated that the IAC does not maintain a website. [Doc. # 275, Hr'g Tr. Jan. 29, 2013, 11:21-22].   If the IAC still does not maintain a website, the IAC should state this in responding to the subpoena duces tecum.

[3] Progressive also challenges the subpoenas on abuse of process grounds. However, Progressive does not have standing to challenge the subpoenas on this basis.  "Ordinarily, a party does not have standing to move to quash a subpoena served on a third party. Rather, only the person or entity to whom a subpoena is directed has standing to file a motion to quash."  Jacobs v. Connecticut Cmty. Technical Colleges, 258 F.R.D. 192, 194-95 (D. Conn. 2009) (citations omitted).  "Numerous cases have held that a party lacks standing

argument is the matter of <u>Artie's Auto Body, Inc. v. Hartford</u>
<u>Fire Ins. Co.</u>, No. X08-CV-03-196141S(CLD) (Conn. Super Ct. 2012)
(hereinafter "Artie's litigation").  There, plaintiffs' counsel
successfully represented a class of auto body repair shops in
Connecticut Superior Court.  Following the entry of a jury
verdict in favor of the class plaintiffs, the Artie's defendant
filed a motion for reconsideration and sanctions based on
plaintiffs' failure to disclose certain documents in discovery.
[Doc. # 256-5].[4] On October 12, 2012, the Superior Court ordered
the parties in Artie's litigation to submit affidavits with
respect to the alleged undisclosed documents. [Doc. # 256-6].
The non-parties contend that the subpoenas at issue here seek
information that plaintiffs believe will defeat the pending
motion for reconsideration, and therefore constitute abuse of
process.[5]

"An action for abuse of process lies against any person
using a legal process against another in an improper manner or
to accomplish a purpose for which it was not designed."  <u>Braden</u>
<u>v. Murphy</u>, No. 3:11cv884(SRU), 2012 WL 1069188, at *3 (D. Conn.
March 29, 2012) (quoting <u>Larobina v. McDonald</u>, 274 Conn. 394,

---

to challenge a subpoena absent a showing that the objecting party has a
personal right or privilege regarding the subject matter of the subpoena."
9a <u>Fed. Practice and Pro.</u>  § 2463.1; <u>Lanford v. Chrysler Motors Corp.</u>, 513
F.2d 1121, 1126 (2d Cir. 1975) ("In the absence of a claim of privilege a
party usually does not have standing to object to a subpoena directed to a
non-party witness.").

[4] The motion for reconsideration requests the Superior Court to reconsider its
ruling denying the Artie's defendant's motion for judgment notwithstanding
the verdict. [Doc. # 256-5].

[5] On April 27, 2009, Judge Eginton entered an Amended Protective Order upon
the joint motion of the parties. [Doc. # 62].  The Amended Protective Order
imposed restrictions on Progressive's production of certain non-party privacy
information and Progressive's personnel information.

403, (2005)).  Indeed, "[t]he gravamen of the action for abuse
of process is the use of the legal process ... against another
<u>primarily</u> to accomplish a purpose for which it was not
designed." <u>Braden</u>, 2012 WL 1069188, at *3 (citing <u>Larobina</u>, 274
Conn. at 403 (quoting Restatement (Second) of Torts § 682
(1977))) (emphasis in original).  Moreover, "[c]omment b to §
682 explains that the addition of 'primarily' is meant to
exclude liability 'when the process is used for the purpose for
which it is intended, but there is an incidental motive of spite
or an ulterior purpose of benefit to the [party].'" <u>Doctor's</u>
<u>Assoc., Inc. v. Wieble</u>, 92 F.3d 108, 114 (2d Cir. 1996) (citing
<u>Mazzochi v. Beck</u>, 204 Conn. 490 (1987)).

As discussed above, the majority of the documents requested
by plaintiffs are relevant to the pending litigation.
Accordingly, because the subpoenas were served primarily for the
purpose for which they were intended, i.e., obtaining documents
and information related to <u>this</u> litigation, the Court declines
to quash the subpoenas.  The Court further trusts that
plaintiffs will abide by the terms of the Amended Protective
Order, and use any produced documents for the benefit of this
litigation.  As such, the Court rejects the non-parties' abuse
of process argument.

   C.   <u>First Amendment Rights of Association and Petition</u>

The non-parties next argue that the subpoenas and notices
of deposition violate their First Amendment rights to associate,
and petition the government.  Plaintiffs argue that the non-

parties failed to meet their burden of establishing the factual predicate to claim such privilege.  For the reasons set forth below, the Court agrees that the non-parties have failed to meet their burden.

"The Supreme Court has long 'acknowledged the importance of freedom of association in guaranteeing the right of people to make their voices heard on public issues.'" In re Motor Fuel Temperature Sales Practices Litigation, 641 F.3d 470, 479 (10th Cir. 2011) (quoting Citizens Against Rent Control v. City of Berkley, 454 U.S. 290, 295 (1981)).  "[B]ecause some collective efforts to express ideas will only be undertaken if they can be undertaken in private," In re Motor Fuel, 641 F.3d at 379 (citation omitted), "[t]he Supreme Court has recognized that disclosure compelled under court order may constitute a restraint on freedom of association." N.Y. State Nat'l Org. for Women v. Terry, 886 F.2d 1339, 1354 (2d Cir. 1989) (citations and internal quotations omitted).

As the Tenth Circuit observed in In re Motor Fuel, "the weight of existing authority instructs that the party claiming a First Amendment Privilege in an objection to a discovery request bears the burden to make a prima facie showing of the privilege's applicability." 641 F.3d at 488 (string citation omitted).  The Second Circuit further recognized that "[i]n each of the [controlling First Amendment] cases the party withholding information from a court or public agency made a prima facie showing that disclosure would infringe its First Amendment

12

rights... [such as demonstrating] that disclosure of members'
identities exposed these members to economic reprisal, loss of
employment, threat of physical coercion, and other
manifestations of public hostility." Nat'l Org. for Women, 886
F.2d at 1355 (quotations omitted).

Here, the non-parties argue that their right to associate
would be chilled by forced disclosure.  Specifically, Mr.
Kehmna's affidavit states that "disclosing what documents IAC
has in its possession whether public or private, would reveal
what IAC and its members are interested in, and what their
legislative and regulatory priorities are, to individuals or
organizations such as the plaintiffs who often have adverse
interests to IAC and its members." [Doc. # 245, Kehmna Aff., at
¶ 7].  Moreover, the non-parties have submitted affidavits from
insurance companies, which posit that "[t]his subpoena, the
corresponding document requests, and any testimony from IAC
staff would have a chilling effect on the willingness of Amica
to participate in IAC discussions and may impact Amica's
willingness to remain as a member of IAC." [Doc. # 245, Amica
Aff., at ¶ 8].  The non-parties argue that these affidavits
present clear evidence of the chilling effect produced by
disclosure-evidence which the court in In re Motor Fuel found to
be lacking.  There the court held:

> [T]he First Amendment privilege at issue in this case
> generally ensures privacy in association when exposure
> of that association will make it less likely that
> association will occur in the future, or when exposure
> will make it more difficult for members of an
> association to foster their beliefs.  These are the

"chilling effects," or consequences of disclosure,
that the First Amendment privilege seeks to avoid. But
the appellants in this case fail to explain how their
main contention on this point—that the information
sought as part of this litigation will give the
plaintiffs an unfair advantage in the policy debate
over the implementation of ATC—will hinder their
associational rights (e.g., lobbying efforts, ability
to communicate among themselves regarding legislative
policy, or maintenance of members within the trade
associations). Instead, the appellants appear simply
to argue that a chill can be "inferred" in this case
without describing how the disclosure of information
would degrade their ability to associate. Furthermore,
the appellants do not cite any case which supports
their assertion that "mak[ing] ... political opponents
privy to ... internal strategies" is "alone"
sufficient to demonstrate a chilling effect on their
First Amendment rights.

In re Motor Fuel, 641 F.3d at 489-90.

The Court finds that the non-parties conclusory affidavits
do not describe how the disclosure of information would degrade
their ability to associate.  Accordingly, the subpoenas and
notices of deposition will not be quashed on First Amendment
grounds.

The seminal case addressing the First Amendment privilege
is the Supreme Court's decision in NAACP v. Alabama, 357 U.S.
449 (1958).  There, the Court recognized that the NAACP had made
"an uncontroverted showing that on past occasions revelation of
the identity of its rank-and file members [ ] exposed these
members to economic reprisal, loss of employment, threat of
physical coercion, and other manifestations of public
hostility."  Id. at 462. Accordingly, the Court concluded that,
under the circumstances, compelled disclosure would "chill" or
"affect adversely the ability of [the NAACP] and its members to

14

pursue their collective effort to foster beliefs which they admittedly have the right to advocate" by "induc[ing] members to withdraw ... and dissuading others from joining [ ] because of fear of exposure of their beliefs shown through their associations and of the consequences of exposure." Id. at 462-63. Similarly, in Bates v. City of Little Rock, 361 U.S. 516 (1960), the Supreme Court found that there was "substantial uncontroverted evidence that public identification of persons ... as members ... had been followed by harassment and threats of bodily harm." Id. at 524; see also ETSI Pipeline Project v. Burlington Northern, Inc., 674 F. Supp. 1489, 1490 (D.D.C. 1987) (granting a motion to quash subpoenas where the record was "clear and uncontroverted" that the requested information would have resulted in reprisal or harassment of the non-party or its officers and contributors).

While making out a prima facie case of harm is not heavy burden, non-parties "must at least articulate some resulting encroachment on their liberties." Nat'l Org. for Women, 886 F.2d at 1355. The Second Circuit has found that "[T]o be cognizable, the interference with associational rights must be 'direct and substantial' or 'significant.'" Fighting Finest, Inc. v. Bratton, 95 F.3d 224, 228 (2d Cir. 1996). Here, the non-parties argue that the revelation of their "interests" and "priorities" to individuals or organization with adverse interests is the harm from which they should be protected. This purported harm, however, exists in virtually all discovery

15

disputes.  The _prima_ _facie_ burden of demonstrating harm would be rendered meaningless if mere aversion to disclosure constituted sufficient encroachment on a group's liberties.

The non-parties have not demonstrated how disclosure of their activities would degrade their ability to associate. While they clearly oppose any disclosure, such exposure via discovery of any activity is likely to make that activity less appealing in retrospect.  In this regard, privacy of association is not uniquely deterred by court-ordered exposure.  Injury must extend beyond one's implicit desire for privacy.  Mere general opposition to or aggravation from mandated discovery is not enough to demonstrate the chilling effects that the First Amendment seeks to avoid.  Rather, parties fighting disclosure under privacy of association grounds must articulate facts that demonstrate injury to their ability to associate, which customarily presents itself in the form of unjustified retaliation or hostility from outside parties.  _See_ _In re Motor Fuel_, 641 F.3d at 480; _Nat'l Org. for Women_, 886 F.2d at 1355.

The non-parties have failed to make an evidentiary showing of a reasonable probability through objective and articulable facts "that disclosure will deter membership due to fears of threats, harassment or reprisal from either government officials or private parties which may affect members' physical well-being, political activities or economic interests."  _See_ _In re Motor Fuel_, 641 F.3d 489.  Accordingly, the Court finds that the non-parties have failed to meet their _prima_ _facie_ burden.

16

Moreover, assuming arguendo that the non-parties have met their burden, the Court nevertheless finds that plaintiffs' interest in obtaining the disclosure is sufficient to justify any detrimental effects on the non-parties, as the evidence of such effects is tenuous.  Therefore, the subpoenas and notices of deposition will not be quashed on First Amendment grounds.

      D.   Attorney-Client Privilege, Work Product Doctrine, and Common Interest Doctrine

Progressive and the non-parties next argue that the Court should quash the subpoenas because they seek information protected by the attorney-client privilege, work product doctrine[6], and common interest doctrine.

The attorney-client privilege protects confidential communications between client and counsel made for the purpose of obtaining or providing legal assistance. United States v. Constr. Prods. Research, Inc., 73 F.3d 464, 473 (2d Cir. 1996). The Court construes the privilege narrowly because it renders relevant information undiscoverable; we apply it "only where necessary to achieve its purpose." Fisher v. United States, 425 U.S. 391, 403 (1976); see In re Grand Jury Investigation, 399 F.3d 527, 531 (2d Cir. 2005). The burden of establishing the applicability of the privilege rests with the party invoking it.

---

[6] The non-parties make a vague argument that the documents sought are shielded by the work-product doctrine.  The party seeking work product protection bears the burden of proving that the sought documents were "prepared in anticipation of litigation or for trial by or for another party or its representative."  QBE Ins. Corp. v. Interstate Fire & Safety Equip. Co., Inc., No. 3:07cv1883(SRU), 2011 WL 692982, at *2  (D. Conn. Feb. 18, 2011) (quoting Fed. R. Civ. P. 26(b)(3)(A)).  Here, the record before the Court is silent with respect to whether the requested documents were prepared in anticipation of litigation.  As such, the Court finds the non-parties have failed to meet their burden that the work product protection should apply, and accordingly denies to quash the subpoenas on this ground.

In re Grand Jury Proceedings, 219 F.3d 175, 182 (2d Cir. 2000);
United States v. Int'l Bd. of Teamsters, Chauffeurs,
Warehousemen and Helpers of Am., AFL-CIO, 119 F.3d 210, 214 (2d
Cir. 1997).

The Court uses a three-pronged standard for determining the
legitimacy of an attorney-client privilege claim.  A party
invoking the attorney-client privilege must show (1) a
communication between client and counsel that (2) was intended
to be and was in fact kept confidential, and (3) was made for
the purpose of obtaining or providing legal advice. In re County
of Erie, 473 F.3d 413, 419 (2d Cir. 2007); Constr. Prods.
Research, Inc., 73 F.3d at 473.  Again, the party asserting the
privilege must establish the essential elements of the
privilege.  Constr. Prods. Research, Inc., 73 F.3d at 473
(citing United States v. Adlman, 68 F.3d 1495, 1499 (2d Cir.
1995)).

1. *Privilege between the IAC and third party members*

The IAC claims an attorney-client privilege with its third
party members, and argues that the subpoenas should be quashed
on privilege grounds.  Specifically, the IAC argues that it
provides legal advice to its members, through its attorneys
including Mr. Kehmna and Susan Giacalone, on various state
legislative and regulatory matters.  In support of its claim of
privilege, the IAC relies on the affidavit of Mr. Kehmna, which
states that he "regularly provide[s] counsel, along with
Attorney (sic) Susan Giacalone, on legal matters that arise

18

during the course of our legislative and lobbying efforts.  Our
communications within the IAC fall within the ambit of the
attorney-client privilege and work product doctrine." [Doc. #
245, Kehmna Aff., at ¶ 9].

        The Court finds that the IAC has failed to meet its burden
of establishing the applicability of the attorney-client
privilege between the IAC and its members.  The record is devoid
of evidence establishing any prong of the attorney-client test,
save for Mr. Kehmna's affidavit.  Such evidence is insufficient
to establish the attorney-client privilege. See Scanlon v.
Bricklayers and Allied Craftworkers, Local No. 3, 242 F.R.D.
238, 245 (W.D.N.Y. 2007) ("Mere conclusory assertions of
privilege or work-product protection are insufficient to satisfy
this burden.") (citation omitted). Moreover, the IAC has failed
to identify any specific documents it believes are covered by
the privilege.  [Doc. # 275, Hr'g. Tr. Jan. 29, 2013, 8:1-12,
10:11-16]. See United States v. Illinois Power Co., No. 99-cv-
0833-MJR, 2003 WL 25593221, at *2 (S.D. Ill. April 24, 2003)
("The [attorney-client] privilege must be established document
by document; a blanket claim of privilege will not suffice.")
(citation omitted); see also P. & B. Marina, Ltd. P'ship v.
Logrande, 136 F.R.D. 50, 54 (E.D.N.Y. 1991) ("A general
allegation or blanket assertion that the [attorney-client]
privilege should apply is insufficient to warrant protection.")
(citations omitted).  Accordingly, the Court declines to quash
the subpoenas on this ground.

However, in producing documents, should the IAC uncover privileged documents which are responsive, the Court directs the IAC to prepare a privilege log compliant with Federal Rule of Civil Procedure 26(b)(5) for any documents it seeks to withhold.

2. *Privilege between the IAC and Progressive*

The non-parties admittedly do not develop an argument on the basis of attorney-client privilege as to Progressive. [Doc. # 275. Hr'g Tr. 9:8-16]. Progressive argues that the IAC serves its members, including Progressive, in large part by the IAC's staff attorneys who, on occasion, provide legal advice on state legislative and regulatory matters. In support of this claim, Progressive relies on Mr. Kehmna's affidavit, and submitted for in camera review 188 documents that have been redacted and/or withheld on the basis of attorney-client privilege or work product protection.  Many of these documents involve communications from Mr. Kehmna and Ms. Giacolone.

"The fact that a lawyer occasionally acts as a lobbyist does not preclude the lawyer from acting as a lobbyist and having privileged communications with a client who is seeking legal advice." In re Grand Jury Subpoenas, 179 F. Supp. 2d 270, 285 (S.D.N.Y. 2001).  However, "if a lawyer happens to act as a lobbyist, matters conveyed to the attorney for the purpose of having the attorney fulfill the lobbyist role do not become privileged by virtue of the fact that the lobbyist has a law degree or may under other circumstances give legal advice on matters that may also be the subject of the lobbying efforts."

Id. (quoting Edna Selan Epstein, The Attorney-Client Privilege & the Work Product Doctrine 239 (2001)); see also U.S. Postal Serv. v. Phelps Dodge Refining Corp., 852 F. Supp. 156, 164 (E.D.N.Y. 1994) ("Lobbying conducted by attorneys does not necessarily constitute legal services for purposes of the attorney-client privilege."). Moreover, "Summaries of legislative meetings, progress reports, and general updates on lobbying activities do not constitute legal advice and, therefore, are not protected by the work-product immunity." P. & B. Marina, 136 F.R.D. at 59; "If a lawyer who is also a lobbyist gives advice that requires legal analysis of legislation, such as interpretation or application of the legislation to fact scenarios, that is certainly the type of communication that the privilege is meant to protect." Robinson v. Texas Auto. Dealers Ass'n, 214 F.R.D. 432, 446 (E.D. Tex. 2003), vacated in other part, No.03-10860, 2003 WL 21911333, at *1 (5th Cir. July 25, 2003); see also Weissman v. Fruchtman, No. 83 Civ. 8958 (PKL), 1986 WL 15669 , at *15 (S.D.N.Y. Oct. 31, 1986) (finding attorney-client privilege properly invoked where client sought legal advice on pending legislation).

After careful review of Mr. Kehmna's affidavit, and the documents submitted for in camera review, the Court finds that the attorney-client privilege is applicable to some of the challenged documents, as detailed in the Discovery Ruling filed today. Accordingly, the Court GRANTS IN PART Progressive's motion to quash the subpoena duces tecum to the extent that it

seeks documents protected by the attorney-client privilege, as it applies to Progressive.   With respect to Mr. Kehmna's deposition, the Court declines to quash the notice of deposition, as the Court finds that plaintiffs seek relevant testimony that would not be protected by the attorney-client privilege or work product doctrine.   There are not privileged areas of testimony that plaintiffs seek that are highly probative of central issues in this case.   The Court has confidence that plaintiffs' counsel understands the line between privileged and non-privileged testimony.   Nevertheless, the Court urges the parties to ensure that protections are in place to prevent the disclosure of privileged information.   The Court suggests the parties coordinate the deposition on a date when the Court is available to address objections, and/or conduct the depositions at the courthouse.

   3. *Common Interest Doctrine*

   The non-parties and Progressive also maintain that the common interest doctrine should protect communications between the IAC, Mr. Kehmna, and the IAC members.   Plaintiffs maintain that the common interest doctrine should not be extended to lobbying activities.

   The common interest rule, also known as the joint defense privilege, "extends the attorney client privilege to privileged communications revealed to a third party who shares a common legal goal with the party in possession of the original privilege." TIFD III-E Inc., v. United States, 223 F.R.D. 47,

50 (D. Conn. 2004) (citing <u>United States v. Schwimmer</u>, 892 F.2d 237 (2d Cir. 1989)).  "Although the parties need not be actively involved in litigation", <u>TIFD III-E, Inc.</u>, 223 F.R.D. at 50, "there must be a commonality of interest amongst the members [] and each party must reasonably understand that the communications are provided in confidence." <u>Cendant Corp v. Shelton</u>, Civil No. 3:06CV00854(AWT), 2007 WL 2460701, at *2 (D. Conn. Aug. 24, 2007) (citation omitted); <u>see also</u> <u>U.S. v. United Tech. Corp.</u>, 979 F. Supp. 108, 111 (D. Conn. 1997) (citation omitted) ("A claim resting on the common interest rule requires a showing that the communication in question was given in confidence and that the client reasonably understood it to be given."). "A community of interest exists among different persons or separate corporations where they have an identical legal interest… The key consideration is that the nature of the interest be identical, not similar, and be legal, not solely commercial." <u>In re F.T.C.</u>, No. M18-304 (RJW), 2001 WL 396522, at *3 (S.D.N.Y. April 19, 2001) (citation omitted).  "The Second Circuit adheres to a strict interpretation of the common interest rule such that 'only those communications made in the course of an ongoing common enterprise and intended to further the enterprise are protected.'" <u>Cendant Corp.</u>, 2007 WL 2460701, at *2 (quoting <u>U.S. v. Salvagno</u>, 306 F. Supp. 2d 258, 271 (N.D.N.Y. 2004)); <u>see also</u> <u>In re F.T.C.</u>, 2001 WL 396522, at *4 (citing <u>United States v. Weissman</u>, 195 F.3d 96, 100 (2d Cir. 1999)) ("[T]he Second circuit has warned that expansions of the

23

attorney-client privilege under the common interest rule should

be 'cautiously extended'").

> As in all claims of privilege arising out of the
> attorney-client relationship, a claim resting on the
> common interest rule requires a showing that the
> communication in question was given in confidence and
> that the client reasonably understood it to be so
> given… The burden of establishing the attorney-client
> privilege, in all its elements, always rests upon the
> person asserting it.  The party asserting the common
> interest rule bears the burden of showing that there
> was an agreement, though not necessarily in writing,
> embodying a cooperative and common enterprise towards
> an identical legal strategy.

Cendant Corp., 2007 WL 2460701, at *3 (citations and internal

quotations omitted).

In considering arguments from Progressive and the non-

parties' in support of applying the common interest doctrine,

the Court has carefully reviewed the affidavits submitted with

the non-parties' motion to quash, and the documents submitted by

Progressive for in camera review.  In light of this review, the

Court finds that the common interest doctrine is applicable to

communications between the IAC's attorneys, Progressive, and the

IAC members which convey or seek legal advice.  First, the Court

has already determined that the attorney-client privilege is

applicable to certain communications between the IAC's attorneys

and Progressive.  Next, the Court is satisfied that Progressive

and the IAC understood that the communications received from the

IAC's attorneys were given in confidence. See Kehmna Aff., Doc.

# 256-2, at ¶ 4 (noting that IAC members have an "expectation

that intra-organizational deliberations and communications

24

regarding legislative and regulatory activities will be kept
confidential."); Amica Aff., Doc. # 256-3, at ¶ 6 ("Amica
expects that intra-organizational deliberations and
communications made in a trade association context regarding
legislative and regulatory matters will be kept confidential.");
Travelers Aff., Doc. # 256-4, at ¶ 7 ("[O]ne of the principal
reasons that Travelers chooses to associate [with the IAC] is to
have the IAC advocate on its behalf with the expectation that
the internal deliberations and communications will be kept
strictly confidential."). Finally, the communications between
the IAC's attorneys, the IAC's members, and Progressive
demonstrate a clear "cooperation in formulating a common legal
strategy." See Bank Brussels Lambert, 160 F.R.D. at 447 ("In
theory, the parties among whom privileged matter is shared must
have a common legal, as opposed to commercial, interest. In
practice, they must have demonstrated cooperation in formulating
a common legal strategy."). Indeed, the documents the Court
reviewed were "directed at advancing the joint interest [of the
IAC's members] vis-à-vis the rest of the world." SCM Corp v.
Xerox Corp., 70 F.R.D. 508, 513 (D. Conn. 1976). It is apparent
that the IAC's attorneys advised the members and coordinated
their legal efforts with respect to proposed legislation,
regulation, and potential litigation. As such, the Court GRANTS
IN PART the motions to quash to the extent that the subpoenas
seek communications protected by the extension of the common
interest doctrine, as applied to communications between the

25

IAC's attorneys, Progressive, and the IAC's members.  However, the Court directs the IAC to include common interest doctrine assertions in its privilege log for any responsive documents it seeks to withhold.

    E.    <u>Undue Burden</u>

Finally, the IAC argues that the subpoena <u>duces</u> <u>tecum</u> is unduly burdensome in light of the voluminous information sought, and the IAC's small staff size. "On timely motion, the issuing court must quash or modify a subpoena that [...] subjects a person to undue burden."  Fed. R. Civ. P. 45(c)(3)(A)(iv).  "An evaluation of undue burden requires the court to weigh the burden to the subpoenaed party against the value of the information to the serving party."  <u>Travelers Indem. Co. v. Metropolitan Life Ins. Co.</u>, 228 F.R.D. 111, 113 (D. Conn. 2005). "With respect to non-parties in particular, [...] the burden on the party from which discovery is sought must, of course, be balanced against the need for the information sought."  <u>Tucker v. American Intern Group, Inc.</u>, 281 F.R.D. 85, 92 (D. Conn. 2012) (quoting <u>Wells Fargo Bank, N.A. v. Konover</u>, No. 3:05CV1924(CFD)(WIG), 2009 WL 585434, at *5 (D. Conn. Mar. 4, 2009)) (internal quotations omitted).

The IAC claims that "[r]equiring the IAC to be engaged in the review and production of the documents which the plaintiffs are requesting would prevent us from performing our core functions and render us ineffective to our members." [Doc. # 256-2, Kehmna Aff., at ¶ 10].  The IAC also contends that

complying with the subpoenas would also result in "an enormous
expense for the IAC, which has limited resources." [Id. at ¶
11].   Although the Court is sympathetic to the IAC's position,
the Court will not quash the subpoena duces tecum on burden
grounds in light of the need for the information sought.  As
previously discussed, the IAC may be the only source for some of
the documents plaintiffs seek.  Additionally, this information
is probative of central issues in the case.  It is also worth
noting that in anticipation of this ruling, the IAC has now had
close to a year to begin searching for documents responsive to
the subpoena.  Nevertheless, to help mitigate any burden on the
IAC, and to the extent that the IAC incurs an "enormous expense"
complying with the subpoena, the IAC may make a request for
plaintiffs to bear the costs associated with reviewing and
producing the requested documents.  The IAC and plaintiffs are
also urged to agree on a production schedule that would limit
the burden on the IAC.  If the plaintiff and the IAC are unable
to agree on such a schedule, they are encouraged to contact
chambers for a telephone conference.

**IV.  CONCLUSION**

    Accordingly, the motions to quash and/or for a protective
order are GRANTED IN PART AND DENIED IN PART, as set forth
above.

    This is not a Recommended Ruling. This is a discovery
ruling or order which is reviewable pursuant to the "clearly
erroneous" statutory standard of review. 28 U.S.C. §

636(b)(1)(A); Fed. R. Civ. P. 72(a); and D. Conn. L. Civ. R. 72.2. As such, it is an order of the Court unless reversed or modified by the district judge upon motion timely made.

SO ORDERED at Bridgeport this 14th day of November, 2013.


_____/s/_____
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE